**Opinion issued March 11, 2025**



In The

# Court of Appeals

For The

## First District of Texas

_____

### NO. 01-24-00723-CV

_____

## IN THE INTEREST OF J.C.P.L., JR., A CHILD

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-00769J**

---

### MEMORANDUM OPINION

Appellant J.C.P.L. ("Father") appeals the trial court's judgment terminating the parent-child relationship with his son, J.C.P.L., Jr. ("Jack").[1] Father contends the evidence was legally and factually insufficient to support the trial court's findings that termination of his parental rights was (1) appropriate on endangerment

---

[1] We refer to the child by a pseudonym.

grounds and for failing to complete the court-ordered service plan, and (2) in Jack's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)(D)–(E), (O)–(P), (b)(2). Father also contends the trial court abused its discretion by appointing the Department of Family and Protective Services ("Department") as Jack's sole managing conservator.

We find no reversible error and affirm.

## I.    Background

A concerned citizen called police after finding three-year-old Jack wandering alone near a busy street around 7:00 a.m. The police contacted the Department, and the Department sent an investigator. Jack appeared to be healthy, aside from some minor scratches on his thumb and forearm. But he was wearing soiled clothing that was too small. And he had "defecated through his diaper to his pants." Jack could not tell the Department's investigator his name, his parents' names, or where he lived. The investigator changed Jack's clothes and diaper, confirmed with a doctor that Jack was not injured, fed him lunch, and let him play at a park while she waited for someone to report Jack missing. About ten hours after Jack was found by the concerned citizen, Jack's Mother called police.

The investigator met with Mother at the family's apartment,[2] which was about a half mile from where Jack was found. Mother told the investigator that she had not noticed Jack was missing until around 2:00 p.m. because she was sleeping.[3] She admitted drinking alcohol and smoking marijuana before going to bed around 1:00 a.m. For most of the night before, Mother was Jack's sole caretaker because Father was at a family party until around 1:00 or 1:30 a.m.

Father also had been drinking alcohol and smoking marijuana the night before Jack wandered away. When he came home from the party, Father played with Jack before falling asleep with Jack on the couch in the living room around 2:00 a.m. Jack was dressed and wearing shoes when he fell asleep, which Father believed might have signaled to Jack that he could leave the house when he woke up. Father described Jack as "programmed when we put his shoes on, [that] we're fixing to go." Father did not notice that Jack was missing when he woke up. Although Father could see that Jack was not in the living room or in the other common areas like the kitchen and bathroom, he assumed Jack was in the bedroom with Mother. Father left to attend another family party around 1:30 p.m. without confirming Jack was in the apartment.

---

[2]     Mother and Father also have an adult son and an adult daughter. Their adult daughter and her boyfriend and child also lived in the family apartment when Jack was removed.

[3]     Mother testified that she looked for Jack on her own before calling police.

The investigator was concerned that neither Mother nor Father asked where Jack had been found or if he had been hurt. The investigator noticed that there was no safety lock on the front door, not much food in the apartment, and no bed for Jack to sleep in. Mother said that Jack used to have a bed but otherwise slept on the living room couch with Father, as he had done before he wandered away.

The Department took custody of Jack and petitioned to terminate Mother's and Father's parental rights on several grounds, including that Mother's and Father's drug use had endangered Jack. The trial court approved service plans for Mother and Father. Among other things, Father's plan required him to maintain a stable income, complete a psychosocial evaluation and follow any therapy recommendations, complete parenting classes, participate in drug and alcohol assessments and follow all recommendations, and agree to drug testing that included a random ETG alcohol test once a month, two random urinalysis tests each month, and a hair follicle drug test every three months.

At the termination hearing, the Department presented evidence that Father completed some, but not all, services. Specifically, the Department caseworker testified that Father had not provided proof of housing or employment. But he did complete parenting classes and attend visits with Jack. And he did complete the drug assessment, which recommended individual therapy, outpatient therapy, and Narcotics Anonymous. Father completed individual therapy but not outpatient

4

therapy or Narcotics Anonymous. He claimed not to know that he needed to attend Narcotics Anonymous meetings.

The caseworker was concerned that both parents continued to use controlled substances while Jack was in the Department's care. Although most of Father's drug test results were negative, he had positive results more than once. Between May 2023 and May 2024, Father tested positive for (1) methamphetamine and benzoylecgonine once, (2) marijuana twice, and (3) cocaine four times. Mother also tested positive for marijuana and cocaine, sometimes during the same month as Father.[4]

Confronted with the positive drug test results, Father acknowledged a history of marijuana use that began at age 18. He also acknowledged Mother's use of marijuana, testifying that he knew she used marijuana during her pregnancy with Jack, that he knew Jack had tested positive for marijuana at birth, and that he knew Mother was smoking marijuana when she was watching Jack the night before he wandered off. But he denied that drinking and smoking interfered with either his or Mother's ability to care for Jack. He also denied that he continued to use marijuana during the case or had ever used cocaine.

---

[4]     Even though her service plan required hair follicle drug tests, Mother kept her hair too short to provide any hair follicle samples. She testified that she preferred to keep a shaved hairstyle. Consequently, her drug tests were limited to ETG tests for alcohol and urinalysis.

The caseworker's other concern was Mother's and Father's parenting skills. She testified that Jack was happy to see Mother and Father on visits, but Mother and Father did not always keep their eyes on him and often used phones or the internet to keep him engaged.

This inattentiveness was notable because, while Jack was in the Department's care, he was diagnosed with autism and ADHD and was recommended for multi-disciplinary treatment that included services to help with socialization skills as well as speech therapy, occupational therapy, physical therapy, and play therapy. Jack had received speech therapy at school and was on the wait list for additional therapies. Additionally, Jack's therapist recommended that Jack be closely supervised in a structured environment, which his foster family provided. The caseworker described Jack as making "tremendous strides" and thriving with his foster family.

Mother acknowledged that her interactions with Jack had improved while he was in the Department's care and receiving therapy. The Department spoke with her and Father about Jack's diagnosis and provided them with information about resources; however, they had not asked questions about his therapies or explored what specialists or services were available in their area. Father testified that he was looking into a "a couple of schools . . . for [Jack's] autism." Asked if he knew what

kind of autism resources were available, Father answered "not right off, no," but that he had a "general idea."

At the close of evidence, the trial court terminated both Mother's and Father's parental rights to Jack. The trial court found that termination was appropriate under four predicate grounds because Mother and Father had engaged in the following acts or omissions:

- knowingly placed or knowingly allowed Jack to remain in conditions or surroundings which endangered Jack's physical or emotional well-being, *see* TEX. FAM. CODE § 161.001(b)(1)(D);

- engaged in conduct or knowingly placed Jack with persons who engaged in conduct which endangered Jack's physical or emotional well-being, *see id.* § 161.001(b)(1)(E);

- failed to comply with the provisions of the court-ordered family services plan that specifically established the actions necessary for Father to obtain the return of Jack, *see id.* § 161.001(b)(1)(O); and

- used a controlled substance, as defined by Chapter 481 of the Health and Safety Code, in a manner that endangered Jack's health or safety and (1) failed to complete a court-ordered substance abuse treatment program, or (2) after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance. *See id.* § 161.001(b)(1)(P).

The trial court also found that termination of Mother's and Father's parental rights was in Jack's best interest and appointed the Department as Jack's sole managing conservator. *See id.* §§ 161.001(b)(2), .207(a). Only Father appealed.

7

## II. Termination of Parental Rights

Father's first through fifth issues challenge the legal and factual sufficiency of the evidence supporting each of the trial court's predicate findings and the best-interest finding. *See id.* § 161.001(b)(1)(D)–(E), (O)–(P), (b)(2).

### A. Standard of review and applicable law

A parent's rights to the "companionship, care, custody, and management" of their child are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quotation omitted); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). A termination decree is final, irrevocable, and permanently divests the parent of all legal rights, privileges, duties, and powers as to the parent-child relationship, except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and construe the involuntary termination statutes in the parent's favor. *Id.* But parental rights "are not absolute" and "are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quotation omitted). Recognizing that parents may forfeit their parental rights by their acts or omissions, we focus on protecting the child's best interest. *See id.*

Because of the severity and permanency of the termination of parental rights, the evidence supporting termination must be clear and convincing. TEX. FAM. CODE § 161.001(b); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing

8

evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. This is an intermediate standard that falls between "preponderance of the evidence," which is used in ordinary civil proceedings, and "reasonable doubt," which is used in criminal proceedings. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979) (per curiam).

This heightened burden of proof results in a heightened standard of review. *In re S.R.*, 452 S.W.3d 351, 358 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). "When reviewing whether the evidence is legally sufficient to support the termination of parental rights, we view the facts in a light favorable to the findings of the trial judge, who heard the testimony, evaluated its credibility, and dealt the closest with the evidence at hand." *In re R.R.A.*, 687 S.W.3d 269, 276 (Tex. 2024) (quotation omitted). We determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009).

Only when the factual sufficiency of the evidence is challenged do we review disputed or conflicting evidence. *Id.* at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quotation

9

omitted).    We cannot substitute our own judgment for the factfinder's when considering the credibility of the evidence.  *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam) (designating factfinder as sole arbiter of credibility).  Nor can we second guess the "resolution of a factual dispute by relying on evidence that is either disputed, or that [the factfinder] could easily have rejected as not credible."  *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

A single predicate ground under Section 161.001(b)(1) of the Family Code supports termination when there is also a finding that termination is in the child's best interest.  *In re A.V.*, 113 S.W.3d at 362.  If the factfinder finds multiple predicate grounds, we may affirm on any one ground.  *See In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.).  But when termination is ordered under the predicate grounds in Subsection (D) or (E), we must review those grounds because they have special significance and can supply the predicate for future terminations.  *See In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (due process mandates appellate review of Subsection (D) and (E) findings when the issue is preserved, even if the termination could be affirmed on another ground); *see also* TEX. FAM. CODE § 161.001(b)(1)(M) (allowing termination if parent has had rights terminated with respect to another child under Subsection (D) or (E)).

**B.** **The evidence was legally and factually sufficient to support termination of Father's parental rights under Subsection (E) for endangering conduct**

We begin with Father's second issue challenging the trial court's termination of his parental rights under Subsection (E) for "engag[ing] in conduct or knowingly plac[ing] the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). To "endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). It requires "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," *id.*, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). The factfinder may infer specific danger to the child's well-being from the parent's misconduct alone. *Boyd*, 727 S.W.2d at 533.

Termination under Subsection (E) must be based on more than a single act or omission. *In re E.G.A.*, Nos. 01-24-00204-CV, 01-24-00206-CV, 2024 WL 3941021, at *14 (Tex. App.—Houston [1st Dist.] Aug. 2024, pet. denied) (mem. op.); *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). The evidence must show a voluntary, deliberate, and conscious course of conduct. *In re S.R.*, 452 S.W.3d at 360; *see also In re M.A.J.*, 612 S.W.3d 398, 405 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (op. on reh'g). In determining

11

whether the parent engaged in endangering conduct, the factfinder may consider conduct that occurred before and after the child was born, conduct in the child's presence and outside the child's presence, and conduct before and after the child was removed from his parent's custody. *In re J.O.A.*, 283 S.W.3d at 345.

Evidence of a parent's illegal drug use may support termination under Subsection (E). *Id.*; *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.) ("Evidence of illegal drug use or alcohol abuse by a parent is often cited as conduct which will support an affirmative finding that the parent has engaged in a course of conduct which has the effect of endangering the child."). The Supreme Court of Texas recently clarified in *R.R.A.* that, "[w]hile illegal drug use alone may not be sufficient to show endangerment, a pattern of drug use accompanied by circumstances that indicate related dangers to the child can establish a substantial *risk* of harm." 687 S.W.3d at 278 (emphasis in original). Drug-use evidence should not be evaluated in isolation; rather, it should be considered alongside evidence showing that "illegal drug use presents a risk to the parent's 'ability to parent.'" *Id.* (quoting *In re J.O.A.*, 283 S.W.3d at 345); *see In re A.V.*, 697 S.W.3d 657, 659 (Tex. 2024) (explaining that *R.R.A.* requires a "holistic endangerment review").

Father asserts that the trial court's Subsection (E) endangerment finding could be based only on his "alleged drug/alcohol use" and "the incident that brought [Jack] into care," *i.e.*, Jack leaving the home. He argues that there was "no clear and

12

convincing evidence of how [his] alleged drug/alcohol use" the evening before "contributed to the conditions that led to [Jack] leaving the home" the morning of the incident. In his view, Jack leaving the home was a "one-off, isolated incident" and no evidence of a continuing course of endangering conduct. We disagree.

Father acknowledged a decades-long history of marijuana use and that Jack was born with marijuana in his system. Mother testified that she and Father smoked marijuana together the night before Jack wandered away, although it is not known at what time they smoked together. Father admitted he went to a party that night and left Jack alone with Mother while she continued to smoke and drink. Father testified he was drinking vodka at the party but later asserted he had a single drink. He also denied smoking marijuana at the party, explaining he had single puff of marijuana but then stating he had a couple puffs.[5] Although he denied that he was high or drunk, there is no evidence establishing the actual amount of alcohol or marijuana he (or Mother) consumed.

Father came home around 1:00 or 1:30 a.m., played with Jack until 2:00 a.m., and then fell asleep with Jack on the couch. Father woke up around 1:00 p.m., showered and got ready to go to a different party, and left for that party assuming Jack was in the bedroom with Mother but without checking. Father did not hear

---

[5] On the day Jack was taken into the Department's care, Father told the Department investigator that he had one glass of vodka and "two hits of a marijuana blunt."

13

Jack leave the house that morning even though the door Jack exited was in the same room where Father was sleeping. At 7:00 a.m. that day, Jack was found wandering alone near a busy road; he was not wearing appropriately sized clothing, had not been fed, and was not reported missing for at least ten hours. Father also testified that Jack usually stayed up with Father until 2:00 a.m. on Friday and Saturday nights.

In sum, Father, who has a history of drug use, stayed up until the early morning hours, during which time he used an unknown amount of marijuana and alcohol, and then slept until around 1:00 p.m., several hours after Jack had dangerously wandered away from the house. The close temporal relationship between this drug and alcohol use and Jack wandering away allows a reasonable inference that the lack of supervision was related to Father's lifestyle and drug and alcohol use and created a substantial risk of harm. *See In re R.R.A.*, 687 S.W.3d at 278–79; *In re J.O.A.*, 283 S.W.3d at 345.

At that moment—when Jack was removed from the home after he was found a half mile away dangerously walking along a road without his parents realizing he was missing until many hours later—Father was faced with the choice of having to avoid drugs and alcohol and change his lifestyle if he wanted to establish he would not endanger Jack's physical well-being in the future. But Father continued to use drugs during the termination proceedings, even though he knew his parental rights were in jeopardy. *See In re E.G.A.*, 2024 WL 3941021, at *17 (parent's continued

14

drug use during termination proceedings was evidence of voluntary, deliberate, and conscious course of conduct, which by its nature, endangered child's well-being). He tested positive for methamphetamine and benzoylecgonine once, marijuana twice, and cocaine four times over the course of about one year, including the month before the termination hearing.[6] He was also positive for alcohol the month before the hearing.

Although Father completed a drug assessment and individual therapy, he failed to complete outpatient therapy or attend Narcotics Anonymous meetings as required by the service plan. *See id.* (upholding endangerment finding, in part, because appellant did not finish service-plan-mandated counseling and continued to use drugs in violation of service plan); *In re A.L.S.*, 660 S.W.3d 257, 273 (Tex. App.—San Antonio 2022, pet. denied) (same). Father vehemently denied any continued drug use during this case, especially regarding marijuana and cocaine, which in the face of his numerous failed drug tests, permitted the trial court to conclude Father lacks credibility and has no intention of ceasing drug use to parent Jack appropriately and safely. *See In re A.J.W.*, No. 04-19-00346-CV, 2019 WL

---

[6] There was also evidence that Father missed two of the random drug tests required under the service plan. The trial court could infer that the missed tests would have had positive results. *See In re E.G.A.*, 2024 WL 3941021, at *17; *see also T.D. v. Tex. Dep't of Family & Protective Servs.*, 683 S.W.3d 901, 914 (Tex. App.—Austin 2024, no pet.) ("The factfinder may infer from a parent's missing Department-requested illegal-drug tests during a parental-rights-termination suit that the tests missed would have come up positive.").

6333468, at *6 (Tex. App.—San Antonio Nov. 27, 2019, no pet.) (mem. op.) ("The court could have rationally concluded that [mother] is unable to protect her children or to provide them a safe and stable environment because she minimizes her drug problem.").

Additionally, Father continues to live with Mother, his wife of 24 years. Mother used marijuana during her pregnancy with Jack, failed numerous drug and alcohol tests during the case, admitted her drug and alcohol use "caused a very dangerous thing to happen to" Jack, admitted she continues to drink alcohol on Fridays and Saturdays, and admitted she had not dealt with her alcohol problem by the time of trial. Mother further agreed that "there's a high likelihood there'll be a next time," referring to Jack getting into a dangerous situation because of her poor parenting. The drug tests showed that Father and Mother used the same drugs some months, and were positive for cocaine on the same day one month, supporting a finding that they continued to use drugs together even when faced with the termination of their parental rights and will continue do so into the future.

The evidence shows a voluntary, deliberate, and conscious course of conduct, which by its nature, endangered Jack's well-being because Father is continuing the behavior that led to Jack dangerously wandering away from home and which could lead to Father being asleep, impaired, or imprisoned when he is supposed to be caring for Jack. *See In re J.O.A.*, 283 S.W.3d at 346 (listing father's use of marijuana

"shortly before the final hearing" as evidence in favor of termination); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (holding illegal drug use may support termination under Subsection (E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned"). The trial court could have reasonably inferred that Father will continue to use illegal drugs and alcohol and engage in the same lifestyle, endangering Jack's well-being in the future as he had in the past. *See In re J.O.A.*, 283 S.W.3d at 346.[7]

Viewing the evidence in the light most favorable to the trial court's Subsection (E) finding and considering undisputed contrary evidence, we conclude that the trial court could have formed a firm belief or conviction that Father engaged in conduct or knowingly placed the child with someone who engaged in conduct that endangered the child's physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(E); *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022). We therefore hold that the evidence was legally sufficient to support termination of Father's parental rights under Subsection (E).

---

[7] This was precisely the Department's concern as expressed in its Family Plan Evaluation: "[The Department] is worried that if [Mother] and [Father] are continuing substance use, not attending to [Jack], and do not address untreated mental health concerns, [Jack] may be placed in another dangerous situation resulting in death."

17

Considering the entire record, Father's testimony disputing the positive drug test results and continuing drug use is not so significant that it required the trial court to find in his favor under Subsection (E). *See* TEX. FAM. CODE § 161.001(b)(1)(E); *In re A.C.*, 560 S.W.3d 624, 631–32 (Tex. 2018). Father denied that his drug use interfered with his ability to care for Jack and denied that he continued to use marijuana during this case or that he had ever used cocaine. But these denials were rebutted by evidence of Jack wandering off when Father had used drugs and by the drug-test results. We cannot second guess the trial court's credibility determinations, even in factual-sufficiency review. *In re H.R.M.*, 209 S.W.3d at 108–09. We therefore hold that the evidence was factually sufficient to support the termination of Father's parental rights under Subsection (E).

Because the evidence was legally and factually sufficient to support termination of Father's parental rights under Subsection (E), we need not address the other predicate grounds for termination. *See In re A.V.*, 113 S.W.3d at 362; *see also* TEX. R. APP. P. 47.1. We overrule Father's second issue and do not reach his first, third, or fourth issues challenging the other grounds for termination.

**C.**     **The evidence is legally and factually sufficient to find that termination of Father's parental rights is in the child's best interest**

We turn to Father's sixth issue challenging the trial court's finding that termination of his parental rights is in the child's best interest. *See* TEX. FAM. CODE § 161.001(b)(2). Along with a predicate violation, a party seeking to terminate

18

another's parental rights must show by clear and convincing evidence that termination is in child's best interest.  *Id.*  The best-interest inquiry is "child-centered and focuses on the child's well-being, safety, and development."  *In re A.C.*, 560 S.W.3d at 631.  There is a strong presumption that the best interest of a child is served by keeping the child with a parent.  *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).  Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest.  TEX. FAM. CODE § 263.307(a).

A factfinder may consider several factors to determine a child's best interest:

- the desires of the child;

- the present and future physical and emotional needs of the child;

- the present and future emotional and physical danger to the child;

- the parental abilities of the persons seeking custody;

- the programs available to assist those persons seeking custody in promoting the best interest of the child;

- the plans for the child by the individuals or agency seeking custody;

- the stability of the home or proposed placement;

- acts or omissions of the parent which may indicate the existing parent-child relationship is not appropriate; and

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).  This list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that

terminating a parent's rights is in the child's best interest. *Id.* at 372; *In re D.R.A.*, 374 S.W.3d at 533. But the lack of evidence cannot be used as if it were clear and convincing evidence supporting a termination finding. *In re E.N.C.*, 384 S.W.3d at 808. In some cases, undisputed evidence of only one factor may be enough to support a finding that termination is in the child's best interest; in other cases, there could be "more complex facts in which paltry evidence relevant to each consideration mentioned in *Holley* would not suffice" to support termination. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002).

In addition, the Family Code sets out factors for evaluating the parent's willingness and ability to provide the child with a safe environment, including:

- the child's age and physical and mental vulnerabilities;

- whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

- the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

- the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable time;

- whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and

- whether an adequate social support system consisting of an extended family and friends is available to the child.

Tex. Fam. Code § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence when conducting the best interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Evidence supporting termination under one of the predicate grounds can also be considered in support of a finding that termination is in the child's best interest. *See In re C.H.*, 89 S.W.3d at 28. A factfinder may infer that past conduct endangering the child's well-being may recur if the child is returned to the parent when assessing the best interest of the child. *In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.); *Jordan*, 325 S.W.3d at 724.

Father contends that no rational factfinder could have formed a strong conviction or belief that severing the parent-child relationship was in Jack's best interest. But several factors support the trial court's finding.

There is no direct evidence about Jack's desire because he was only five years old at the time of trial and did not testify. *See Holley*, 544 S.W.2d at 371–72. The caseworker testified that Jack had bonded with his foster family. *See In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with [their] parent."). But she also testified that Jack was happy to see

Mother and Father on visits and enjoyed spending time with them. So, the first *Holley* factor is neutral.

The same is not true for several other factors implicated by the evidence of Father's continuing pattern of illegal drug use. *See In re Z.L.W.*, No. 01-12-00736-CV, 2013 WL 396270, at *4 (Tex. App.—Houston [1st Dist.] Jan. 31, 2013, no pet.) (mem. op.) ("Evidence establishing one of the predicate acts under [TEX. FAM. CODE § 161.001(b)](1) may also be relevant to determining the best interest of the child."). The evidence discussed above is relevant, not only to Father's parenting abilities and to the stability of the home he would provide, but also to the emotional and physical needs of Jack, now and in the future, and to the emotional and physical danger in which Jack could be placed, now and in the future—needs and dangers that the evidence established would require special attention due to Jack's autism and ADHD. *See, e.g.*, *Holley*, 544 S.W.2d at 371–72 (factors two, three, four, and seven); *In re N.J.H.*, 575 S.W.3d 822, 834–36 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (father's history of drug use and continued drug use during case bore on second, third, fourth, and seventh *Holley* factors—child's emotional and physical needs, emotional and physical danger to the child, father's parental abilities, and stability of home—and supported best-interest finding); *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (finding pattern of illegal drug use suggested mother was not willing and able

to provide child with safe environment—a primary consideration in determining the child's best interest). Father's drug use also indicated instability in the home environment because it exposed Jack to the possibility that Father may be impaired or imprisoned.

Although Father underwent some treatment and had several negative drug tests while the termination case was pending, he did not complete the services required to address the illegal-drug-use concern that brought Jack into the Department's care. The trial court could reasonably find that Father's history of illegal drug use, positive drug test results, and failure to complete all services related to substance abuse weighted the second, third, fourth, and seventh *Holley* factors in favor of termination. *See In re N.J.H.*, 575 S.W.3d at 834–36; *see also In re S.C.F.*, 522 S.W.3d 693, 703 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (holding trial court sitting as factfinder could credit lab reports and witness testimony over father's denial of drug use and his claim that positive drug test result was false).

The trial court could also consider other evidence of instability in the home in weighting these factors in favor of termination. Although Father testified that he received disability income and had moved into stable housing before trial, he acknowledged that he had moved "from spot to spot" during the termination proceedings and not provided the Department with proof of housing. The caseworker testified that the missing proof was not just as to housing but also as to

Father's employment. Father testified that he was not employed because he has cerebral palsy and receives "full disability," but the child advocate reports from September 2023 and January 2024, which were admitted into evidence, stated that Father had not provided proof of his disability income. "Without stability, income, or a home, [a parent] is unable to provide for the child's emotional and physical needs." *In re T.G.R.-M.*, 404 S.W.3d 7, 17 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (quotation omitted).

The trial court heard other evidence that Jack was thriving in an adoptive foster placement that provided him with the supervision and structure he needed as a child with autism and ADHD. The caseworker testified that Jack's foster mother ensured that Jack received speech therapy at school and actively sought out other services. In contrast, despite knowing Jack's diagnosis, Father had not asked questions about Jack's therapies or explored what specialists or services were available beyond considering a couple of schools. And he was not always actively engaged in supervising Jack during visits. From this evidence, the trial court could reasonably find that the fifth and sixth *Holley* factors weighed in favor of termination.

We therefore agree with the Department that, relative to the legal sufficiency of the evidence, viewing all the evidence in the light most favorable to the trial court's best-interest finding and considering any undisputed contrary evidence, a

24

reasonable factfinder could have formed a firm belief or conviction that terminating Father's parental rights was in Jack's best interest. And, relative to the factual sufficiency of the evidence, considering the entire record, we conclude that the disputed evidence that a reasonable factfinder could not have credited for the best-interest finding is not so significant that a reasonable factfinder could not have formed a firm belief or conviction that is the best-interest finding was true. We hold the evidence is legally and factually sufficient to support the trial court's best-interest finding as to Father. *See In re A.C.*, 560 S.W.3d at 630–31.

We overrule Father's fifth issue.

### III. Conservatorship of the Child

In his sixth issue, Father challenges the trial court's appointment of the Department as Jack's sole managing conservator. Because we have overruled Father's challenges to the trial court's order terminating his parental rights, the order has divested Father of his legal rights and duties related to Jack. *See* TEX. FAM. CODE § 161.206(b). Consequently, Father does not have standing to challenge the portion of the order appointing the Department as Jack's sole managing conservator. *See In re R.J.*, 579 S.W.3d 97, 120–21 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (concluding father could not challenge the Department's appointment as sole managing conservator after Court overruled father's challenge to the termination of his parental rights); *In re J.D.G.*, 570 S.W.3d at 856 (explaining the Department's

25

appointment as sole managing conservator was a "consequence of termination" after overruling parent's challenge to a termination order).

We overrule Father's sixth issue.

## IV.  Conclusion

Having overruled the issues that are necessary to resolve Father's appeal, we affirm the trial court's judgment terminating Father's parental rights.


Andrew Johnson
Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.